[846 NE2d 448, 813 NYS2d 18]

CWM Chemical Services, L.L.C., Appellant, v Arthur J. Roth, as Commissioner of New York State Department of Taxation and Finance, et al., Respondents.

Argued February 14, 2006; decided March 23, 2006

**POINTS OF COUNSEL**

*Kirkpatrick & Lockhart Nicholson Graham, LLP,* Boston, Massachusetts (*Roger C. Zehntner* and *Charles J. Dyer* of counsel), and *Buchanan Ingersoll PC,* Buffalo (*Patrick J. Maxwell* of counsel), for appellant. I. The disposal tax under ECL 27-0923 (2) discriminates against interstate commerce in waste and is unfairly apportioned in violation of the Commerce Clause of the United States Constitution. (*Complete Auto Transit, Inc. v Brady,* 430 US 274, 976; *Homier Distrib. Co. v City of Albany,* 90 NY2d 153; *Chemical Waste Management, Inc. v Hunt,* 504 US 334; *City of New York v State of New York,* 94 NY2d 577; *McLeod v J. E. Dilworth Co.,* 322 US 327; *New Energy Co. of Ind. v Limbach,* 486 US 269; *Tennessee Gas Pipeline Co. v Urbach,* 96 NY2d 124; *Hughes v Oklahoma,* 441 US 322; *Oregon Waste Systems, Inc. v Department of Environmental Quality of Ore.,* 511 US 93.) II. The Appellate Division improperly failed to strike down the disposal tax under ECL 27-0923 (2) as facially discriminatory and unfairly apportioned in violation of the Commerce Clause. (*Matter of Westinghouse Elec. Corp. v Tully,* 63 NY2d 191; *Matter of Weil, Gotshal & Manges v O'Cleireacain,* 83 NY2d 591; *Matter of Suffolk County Fed. Sav. & Loan Assn. v Bragalini,* 5 NY2d 579; *Tennessee Gas Pipeline Co. v Urbach,* 96 NY2d 124; *Matter of United States Steel Corp. v Gerosa,* 7 NY2d 454; *Elmhurst Fire Co. v City of New York,* 213 NY 87; *Matter of Wood v Irving,* 85 NY2d 238; *Ivey v State of New York,* 80 NY2d 474; *Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation,* 75 NY2d 88; *Boreali v Axelrod,* 71 NY2d 1.) III. The Appellate Division's "reinterpretation" of the remediation waste exemption under ECL 27-0923 (3) (c) is wrong. (*People v Mobil Oil Corp.,* 48 NY2d 192; *Sanders v Winship,* 57 NY2d 391; *Matter of Brown v Wing,* 93 NY2d 517; *Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 62 NY2d 539; *Kranker v Levitt,* 68 Misc 2d 224; *Matter of Howard Johnson Co. v State Tax Commn.,* 65 NY2d 726; *Hoffman v City of Syracuse,* 2 NY2d 484; *Matter of Lockport Union-Sun & Journal v Preisch,* 7 AD2d 502, 8 NY2d 54; *Matter of DeTroia v Schweitzer,* 87 NY2d 338; *Milbrandt v Green Refractories Co.,* 79 NY2d 26.) IV. The Appellate Division's affirmance of the Supreme Court's "third decretal paragraph"

without modification is in error and conflicts with the Appellate Division's own opinion and order. (*American Trucking Assns., Inc. v Scheiner,* 483 US 266.) V. The Appellate Division's opinion and order fails to provide CWM Chemical Services, L.L.C. proper relief as required by *McKesson Corp. v Division of Alcoholic Beverages & Tobacco, Fla. Dept. of Business Regulation* (496 US 18 [1990]). (*Atchison, T. & S. F. R. Co. v O'Connor,* 223 US 280; *Tennessee Gas Pipeline Co. v Urbach,* 96 NY2d 124; *Gautier v Ditmar,* 204 NY 20; *Matter of Mollenhauer,* 257 App Div 286; *Shields v Katz,* 143 AD2d 743; *Ontario Trucking Assn. v New York State Dept. of Taxation & Fin.,* 168 Misc 2d 648, 236 AD2d 70, 92 NY2d 1027; *American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin.,* 191 AD2d 61; *Niagara Mohawk Power Corp. v City School Dist. of City of Troy,* 59 NY2d 262; *Matter of First Natl. City Bank v City of N.Y. Fin. Admin.,* 36 NY2d 87.)

*Eliot Spitzer, Attorney General,* Albany (*Andrew D. Bing, Caitlin J. Halligan, Daniel Smirlock* and *Peter H. Schiff* of counsel), for respondents. I. The Appellate Division correctly declared only the tainted exemptions unconstitutional rather than striking the entire disposal tax. (*Matter of Westinghouse Elec. Corp. v Tully,* 63 NY2d 191; *People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48; *General Elec. Co. v New York State Dept. of Labor,* 936 F2d 1448; *People v Liberta,* 64 NY2d 152; *Field v Clark,* 143 US 649; *Matter of Hynes v Tomei,* 92 NY2d 613; *Tennessee Gas Pipeline Co. v Urbach,* 96 NY2d 124; *LaValle v Hayden,* 98 NY2d 155; *Alliance of Am. Insurers v Chu,* 77 NY2d 573; *Matter of Federal Deposit Ins. Corp. v Commissioner of Taxation & Fin.,* 83 NY2d 44.) II. Due process does not require that CWM Chemical Services, L.L.C. receive a refund in this action. (*McKesson Corp. v Division of Alcoholic Beverages & Tobacco, Fla. Dept. of Business Regulation,* 496 US 18; *Tully v Griffin, Inc.,* 429 US 68; *Klostermann v Cuomo,* 61 NY2d 525; *Bankers Trust Corp. v New York City Dept. of Fin.,* 1 NY3d 315; *Matter of Consolidated Rail Corp. v Tax Appeals Trib. of State of N.Y.,* 231 AD2d 140, 91 NY2d 848; *Matter of Brault v New York State Tax Appeals Trib.,* 265 AD2d 700; *Carpenter v Shaw,* 280 US 363; *Ward v Board of Commr's of Love Cty.,* 253 US 17; *Atchison, T. & S. F. R. Co. v O'Connor,* 223 US 280.) III. New York law precludes the relief CWM Chemical Services, L.L.C. seeks in this action. (*Tennessee Gas Pipeline Co. v Urbach,* 269 AD2d 19, 96 NY2d 124; *Matter of Finch, Pruyn & Co. v Kearns,* 282 AD2d 858; *Stahlbrodt v Commissioner of Taxation & Fin. of State of N.Y.,* 171 Misc 2d 571, 246 AD2d 793, 92 NY2d 646; *Shields v Katz,* 143 AD2d 743; *Harper v Virginia Dept. of Taxa-*

*tion,* 509 US 86; *American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin.,* 191 AD2d 61, 84 NY2d 31; *Ontario Trucking Assn. v New York State Dept. of Taxation & Fin.,* 168 Misc 2d 648, 236 AD2d 70, 92 NY2d 1027; *Solnick v Whalen,* 49 NY2d 224; *Matter of First Natl. City Bank v City of N.Y. Fin. Admin.,* 36 NY2d 87; *Morell v Balasubramanian,* 70 NY2d 297.)

*Bond, Schoeneck & King, PLLC,* Syracuse (*Barry R. Kogut* and *Kathleen M. Bennett* of counsel), for General Motors Corporation, amicus curiae. I. The disposal tax discriminates against interstate commerce in violation of the Commerce Clause. (*Complete Auto Transit, Inc. v Brady,* 430 US 274; *Chemical Waste Management, Inc. v Hunt,* 504 US 334.) II. The Appellate Division erred in its assessment of legislative intent in fashioning relief for the unconstitutional imposition of the disposal tax. (*Waste Recovery Enters. v Town of Unadilla,* 294 AD2d 766, 100 NY2d 614, 1 NY3d 507, 542 US 904; *Matter of Westinghouse Elec. Corp. v Tully,* 63 NY2d 191; *Matter of NewChannels Corp. v Tax Appeals Trib. of Dept. of Taxation & Fin. of State of N.Y.,* 279 AD2d 164; *Debevoise & Plimpton v New York State Dept. of Taxation & Fin.,* 80 NY2d 657.) III. In assessing legislative intent, the Court needs to consider environmental issues in a broad context including the impact of striking down the disposal tax exemptions on the maintenance of sufficient hazardous waste management capacity in New York. (*Matter of Siwek v Mahoney,* 39 NY2d 159; *People ex rel. Nichols v Board of County Canvassers of Onondaga County,* 129 NY 395; *Affronti v Crosson,* 95 NY2d 713.)

**OPINION OF THE COURT**

READ, J.

The courts below held, and the State does not contest, that State Superfund's disposal tax, a part of the statutory financing scheme for the cleanup of inactive hazardous waste disposal sites in New York State, unlawfully discriminates against interstate commerce and thus violates the Commerce Clause of the United States Constitution. We are asked on this appeal how to cure the constitutional infirmity while remaining true to the Legislature's intent. For the reasons that follow, we conclude that striking the disposal tax—ECL 27-0923 (2)—in its entirety does the least damage to the overall statutory design.

I.

By the late 1970's, Love Canal and similar toxic artifacts of past industrial activity commanded considerable public atten-

tion, producing alarm and provoking widespread calls for government action. Because legislative intent controls the outcome of this appeal, we begin by surveying the succession of complex environmental laws adopted over the ensuing years to address this legacy of hazardous waste sites.

With chapter 282 of the Laws of 1979, New York became one of the first states in the nation to grapple with the problem. In general, this legislation directed the New York State Department of Environmental Conservation (DEC) to conduct a statewide inventory and establish a statewide registry of inactive hazardous waste disposal sites.[1] The statute also authorized DEC (or, in certain circumstances, the Commissioner of Health) to order those responsible for the contamination at a site to clean it up, and, if these parties were unwilling to comply, to fix the site with public funds and sue later to recoup reasonable expenses. The State was also authorized to spend public monies to clean up true orphan sites—those where there were no identified or solvent responsible parties. Monies were appropriated for these purposes.

A year later, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 USC §§ 9601-9675). CERCLA provided broad federal authority to force potentially liable parties to clean up releases or threatened releases of hazardous substances endangering public health or the environment, and to reimburse the federal government for cleanup costs that it incurred. The statute also established a $1.6 billion Hazardous Substance Response Fund, commonly referred to as the Federal Superfund, to pay for cleanup and related activities undertaken by the federal government. The Superfund was financed by a so-called "front-end" tax on petroleum products and chemical feedstocks.

The Legislature soon revisited the subject of inactive hazardous waste disposal sites, enacting chapter 857 of the Laws of 1982. This legislation strengthened and clarified the powers vested in DEC and the Department of Health by the 1979 statute. Its "central feature," however, was the creation of a nonlapsing revolving fund known as the Hazardous Waste Remedial Fund, or State Superfund, supported by special assessments

---

1. In general, an "[i]nactive hazardous waste disposal site" is "any area or structure used for the long term storage or final placement of hazardous waste" (ECL 27-1301 [2]).

imposed on industry (see Governor's Approval Mem, 1982 NY Legis Ann, at 275). This fund, projected to reach $10 million by the end of its first year, was to supply "monies to clean up the many sites for which no Federal Superfund support [was] available" as well as "to provide the State's share of monies for clean-up projects undertaken by the federal government pursuant to its Superfund,[2] and to make monies available for hazardous waste emergencies" (id.).

Section 27-0923 of the Environmental Conservation Law imposed special assessments upon "every person engaged within the state in the generation of [an identified or listed] hazardous waste" and "persons holding permits for the storage, treatment or disposal of hazardous waste" (see former ECL 27-0923 [1], [2]). The generator taxes were $12 per ton of hazardous waste generated and disposed in a landfill; $9 per ton of hazardous waste generated and treated or disposed off the site of generation, other than in a landfill; and $2 per ton of hazardous waste incinerated on the site where generated (see former ECL 27-0923 [1] [a], [b], [c]). The corresponding disposal taxes levied on transfer, storage and disposal facilities operating in New York were $12 per ton of hazardous waste disposed in a landfill; and $9 per ton of hazardous waste treated or disposed, other than in a landfill, in any facility located off the site where the waste was generated (see former ECL 27-0923 [2] [a], [b]).

These so-called "waste-end" taxes were to be deposited in the newly created State Superfund, which also included any appropriations as well as fines for violations of certain environmental offenses (see former State Finance Law § 97-b [1], [2]). As the legislation's sponsor explained, the State Superfund was

> "the product of months of negotiations between the Senate, Assembly, Governor's office, DEC, and environmental and business interests. All of these groups have agreed that this [legislation] constitutes the best compromise between the need for a healthful environment and the practical limitations

---

**2.** CERCLA requires states to pay or assure payment of 10% of the costs of remedial actions undertaken by the United States Environmental Protection Agency (EPA) to respond to releases at facilities within their borders, including all future maintenance (see 42 USC § 9604 [c] [3] [C] [i]). This figure increases to a minimum of 50% of the costs if a state or any of its political subdivisions operated the facility, either directly or through a contractual relationship or otherwise, at which the release occurs (see 42 USC § 9604 [c] [3] [C] [ii]).

on both industry and the state" (*see* Letter of Support from Senator John R. Dunne to John G. McGoldrick, Governor's Counsel, at 2, Bill Jacket, L 1982, ch 857).

The State Superfund sent a "clear signal to the generators . . . that the public policy of the state is to clean up inactive chemical dumps," and also "ensure[d] that the future treatment, storage and disposal of such wastes is done properly" by "creat[ing] incentives to reduce the volume of wastes" even though "[r]educing wastes . . . lowers fees paid into the superfund" (*see* Revised Mem in Support, at 4, Bill Jacket, L 1982, ch 857).

The legislation included several specific exemptions. Hazardous waste that was recycled or otherwise recovered for beneficial use as raw materials was exempt from taxation (*see* ECL former 27-0923 [1] [e]; [2] [d]). This exemption, like the structure of the assessment system, sought to promote and reward more desirable waste management practices. For purposes of section 27-0923, "generation of hazardous waste" did not include "retrieval or creation of hazardous waste which [was] disposed of due to remediation of an inactive hazardous waste disposal site" (ECL former 27-0923 [1] [d]). This exemption furthered the State's public policy to encourage private parties to undertake remedial actions. Finally, no disposal tax was "imposed upon disposal of hazardous waste where such waste was generated by persons subject to [the generator tax]" (ECL former 27-0923 [2] [c]). The Legislature understood that disposal taxes would be passed on to customers, and so levied them only against out-of-state wastes because "New York generators using [in-state treatment, storage and disposal] facilities . . . pay at the point of generation" (*see* Revised Mem in Support, at 1, Bill Jacket, L 1982, ch 857). In other words, the Legislature plainly intended for these taxes to be paid only once, either at the point of generation or the point of disposal.

In 1985, the Legislature enacted "an integrated package of three revenue sources to accelerate the clean-up of hazardous waste disposal sites in New York State," principally because the generator and disposal taxes adopted in 1982 "never generated the annual income which was expected" (*see* Governor's Mem approving L 1985, ch 38, 1985 NY Legis Ann, at 51). The generator taxes were raised from $12 to $27 per ton for hazardous waste generated and disposed in a landfill, now specifically including residues from on-site treatment; remained $9 per ton for hazardous waste incinerated off the site of generation;

remained $2 per ton for hazardous waste incinerated on the site where the waste was generated; and were raised from $9 to $16 per ton for hazardous waste generated and treated or disposed off the site of generation, other than in a landfill or by incineration (*see* ECL former 27-0923 [1] [a], [b], [c], [d]). The corresponding disposal taxes were raised from $12 to $27 per ton for hazardous waste disposed in a landfill; remained $9 per ton for hazardous waste incinerated off the site of generation; and were raised from $9 to $16 per ton for hazardous waste treated or disposed, other than in a landfill or by incineration, in any facility located off the site where the waste was generated (*see* ECL former 27-0923 [2] [a], [b], [c]).[3] The Legislature retained the exemptions for hazardous waste handled by resource recovery methods (*see* ECL former 27-0923 [3] [a]), and the exemptions for hazardous waste generated during cleanup of an inactive hazardous waste disposal site located in New York (renumbered as ECL 27-0923 [3] [c]) and hazardous waste already taxed once by New York at the point of generation (relettered as ECL 27-0923 [2] [d]).

It was anticipated that these modified waste-end taxes would raise about $6 million annually for State Superfund (Mem of Senator Hugh T. Farley, 1985 NY Legis Ann, at 50). The Legislature counted on an additional $6 million per year from doubling the annual program fees imposed by sections 72-0402 and 72-0502 of the ECL on hazardous waste generators and transporters; and an additional $10 million per year by adding a license fee surcharge of 2½ cents for each barrel of petroleum transferred within the state by major petroleum facilities, which are those with total storage capacity of 400,000 gallons or more (*see* Navigation Law former § 174 [4] [b]) (*id.* at 50-51). These industry taxes plus $8 million from the State's General Fund were thus projected to provide an annual revenue stream of $30 million for State Superfund.

Finally, chapter 38 included a straightforward severability clause. This provision states that

> "[i]f any clause, sentence, paragraph, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder

---

**3.** This tax schedule and structure remain the same today, although the Legislature has enacted additional exemptions over the years (*see e.g.* ECL 27-0923 [1] [e], [f]).

thereof, but shall be confined in its operations to the clause, sentence, paragraph, section or part thereof directly involved in the controversy in which such judgment shall have been rendered" (L 1985, ch 38, § 19).

Because New York required far more than $30 million in annual revenues to finance remedies at the hundreds of inactive hazardous waste disposal sites identified throughout the state, the Legislature the next year enacted chapter 511 of the Laws of 1986, the Environmental Quality Bond Act (EQBA). This statute authorized the creation of general obligation debt in the amount of $1.45 billion upon its approval by the electorate in November 1986. Of that amount, $1.2 billion was earmarked for State Superfund.[4]

Even this sum proved unequal to the task. By the late 1990's, it had become apparent that EQBA funds would be fully obligated before the State ran out of remedial work. The Legislature tackled the shortfall by restructuring and refinancing State Superfund as part of chapter 1 of the Laws of 2003, a massive environmental initiative that also reformed DEC's Superfund-related authorities and created a new program to encourage private investment in the cleanup and redevelopment of brownfields. This legislation authorized $120 million annually for State Superfund, to be financed with bonds issued by the Environmental Facilities Corporation (EFC), not to exceed a total of $1.2 billion.

State Superfund is now comprised of five separate accounts as specified in State Finance Law § 97-b. One of these accounts—the Industry Fee Transfer Account (IFTA)—consists of multiple revenue streams: the special assessments at issue in this litigation; hazardous waste program surcharges imposed upon generators by chapter 1 of the Laws of 2003, which range from $4,000 to $360,000 per year (see ECL 72-0403), and any penalties or interest related to these surcharges; one half the revenue from any penalties and interest related to hazardous waste or transporter program fees under ECL 72-0402 and 72-0502 respectively; and petroleum license fee surcharges under Navigation Law § 174 (4) (b), which are now 4¼ cents per barrel. IFTA and the General Fund each pay half the debt service

---

4. Of this $1.2 billion, up to $100 million was to be made available for no-interest loans to municipalities to assist in the proper closure of municipal landfills. The remaining $250 million authorized by the EQBA was to be used for land acquisition.

on bonds issued to finance State Superfund (State Finance Law § 97-b [11]). The New York State Assembly Memorandum in Support of chapter 1 states that "[o]n average, approximately $45 million [in State Superfund] is from [industry fees comprising IFTA] to be used toward current and future debt service and matched by the General Fund" (*see* Mem in Support of L 2003, ch 1, 2003 McKinney's Session Laws of NY, at 1580).[5]

## II.

Plaintiff CWM Chemical Services, L.L.C., owns and operates a sizable licensed hazardous waste treatment and disposal facility in Model City, New York, near Niagara Falls, Buffalo and the Canadian border. Beginning with the quarterly tax period ending on December 31, 1995, CWM stopped paying the disposal tax for a specific class of out-of-state hazardous waste—those wastes generated in out-of-state CERCLA cleanups undertaken by EPA rather than by another governmental party or a private party. CWM explains its decision to stop paying these disposal taxes, which it had previously paid while harboring doubts about their constitutionality, as a last-ditch response to competitive pressures that it perceived as threatening its solvency.

Over the next four years, the New York State Department of Taxation and Finance (DTF) issued CWM deficiency notices seeking to recover the unpaid taxes plus interest. CWM challenged the notices administratively, contending that the disposal tax violated the Commerce Clause; however, the agency repeatedly declined to consider CWM's defense, essentially pleading lack of jurisdiction at the administrative level to determine a state statute's facial constitutionality.

Frustrated administratively, CWM commenced this declaratory judgment action in Supreme Court on May 10, 2001 against DTF and DEC and their respective Commissioners (the State). CWM asserted that ECL 27-0923 discriminated against inter-

---

5. Neither the record nor the legislative history of chapter 1 of the Laws of 2003 discloses precisely how much the waste-end taxes contribute to IFTA. In the Economic and Revenue Outlook submitted with his 2006-2007 Executive Budget, the Governor indicates that the total revenue received from the waste-end taxes in the 2004-2005 fiscal year was $2.3 million (*see* <http://publications.budget.state.ny.us/executive.html>, cached at <http://www.courts.state.ny.us/reporter/webdocs/nys_dob_exec_budget.htm>). This figure obviously would not reflect those disposal taxes that CWM did not pay. Postsubmission representations by the parties, however, suggest that the total revenue collected by the waste-end taxes would have been just over double if CWM had paid its assessments in full.

state commerce by taxing disposal of "remediation waste" resulting from out-of-state hazardous waste cleanups, but not the same kind of waste when generated during in-state hazardous waste cleanups; and by exempting process or "base business" hazardous waste subject to New York's generator tax "but providing no similar exemption for waste that has been subjected to a generator tax in another state." CWM asked Supreme Court to declare the disposal tax unconstitutional, enjoin its enforcement and refund the disposal taxes that it had paid for out-of-state hazardous waste received at Model City. CWM subsequently moved for summary judgment, which the State opposed.

Supreme Court granted CWM partial summary judgment, declaring ECL 27-0923 (3) (c) "facially discriminatory in violation of the Commerce Clause . . . *insofar* as it exempts from taxation hazardous waste resulting from remediation of in-state inactive hazardous waste sites without affording a similar exemption to remediation of similar out-of-state inactive hazardous waste sites" (emphasis added). The court also declared ECL 27-0923 (2) (d)

> "facially discriminatory in violation of the Commerce Clause . . . *insofar* as it exempts from taxation the disposal of hazardous waste generated in New York State which has been taxed pursuant to ECL § 27-0923 (1), without exempting from taxation the disposal of hazardous waste generated in another state which has been taxed pursuant to any other state's similar generation tax" (emphasis added).

Supreme Court ordered the refund of all disposal taxes paid by CWM on out-of-state cleanup waste. As for out-of-state process waste, the court ordered a refund "equal to taxes paid to another state upon similar generation not to exceed the exemption granted to such hazardous wastes generated in New York." In essence, Supreme Court cured the disposal tax's constitutional defect by extending the exemptions for in-state cleanup and process wastes to out-of-state cleanup and process wastes. The practical effect was to preserve the disposal tax but to expand its exemptions, thus reducing the amount of revenue that it raised. The court limited refunds due CWM to those improperly collected disposal taxes for which timely claims had been made under Tax Law § 1087, which sets out the procedure for claiming tax refunds and establishes a three-year statute of limitations. CWM appealed and the State cross-appealed.

While agreeing with Supreme Court that the disposal tax discriminated against interstate commerce in violation of the Commerce Clause, the Appellate Division tacked the other way on remedy. Rather than extending the exemptions for in-state cleanup and process wastes to out-of-state cleanup and process wastes, the Court eliminated these exemptions from the disposal tax altogether. Indeed, the Court implied that in-state cleanup waste should never have been immune from the disposal tax in the first place, contrary to DEC's long-standing interpretation of ECL 27-0923.

The practical effect of the Appellate Division's decision was to expand the disposal tax rather significantly. The Court considered this remedy proper because, in its view, chapter 38 of the Laws of 1985 was designed only to "rais[e] revenues necessary to fund the cleanup of looming threats posed by inactive hazardous waste sites" and "[p]artial invalidity must not curtail the entire revenue stream necessary to fund the cleanup of inactive hazardous waste sites in New York" (15 AD3d 77, 84 [4th Dept 2004]). Noting that its decision might "result in a disproportionate assessment on hazardous waste generated in state," the Court "invite[d] the Legislature to consider amending ECL 27-0923 to address any disproportionate assessment" (*id.* at 87). Finally, the Appellate Division observed that to the extent that CWM might be entitled to relief on the ground that portions of the disposal tax were unconstitutional, it should seek relief administratively as provided for in article 27 of the Tax Law (*see* ECL 27-0923 [6]).

■ CWM appealed as of right on constitutional grounds pursuant to CPLR 5601 (b) (1). The key question for us to decide is whether the Appellate Division selected the proper remedy for the constitutional infirmity that it found. There are, in fact, three options for severing the invalid portion of the special assessments and preserving the remainder. We may effectively extend the exemptions for in-state cleanup and process wastes to out-of-state cleanup and process wastes, which is what Supreme Court did. Both parties object to this approach as unworkable in practice, and we do not consider it further. Or we may eliminate the exemptions from the disposal tax for in-state cleanup and process wastes. This is the path taken by the Appellate Division, which the State urges us to follow. Finally, we may sever the disposal tax from the special assessments. This is the option advocated by CWM, which we adopt.

### III.

The basic rule governing severability was elegantly put by Judge Cardozo decades ago:

> "The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots" (*People ex rel. Alpha Portland Cement Co. v Knapp*, 230 NY 48, 60 [1920]).

This exercise

> "requires first an examination of the statute and its legislative history to determine the legislative intent and what the purposes of the new law were, and second, an evaluation of the courses of action available to the court in light of that history to decide which measure would have been enacted if partial invalidity of the statute had been foreseen" (*Matter of Westinghouse Elec. Corp. v Tully*, 63 NY2d 191, 196 [1984]).

The Legislature most assuredly enacted the waste-end taxes to produce revenue to support State Superfund. But even at the program's inception in 1982, when the generator and disposal taxes were State Superfund's primary, if not sole, revenue source, the Legislature also consciously designed the statute to serve competing purposes. The Legislature wanted to encourage certain behaviors—such as the incineration of hazardous waste, for example—and to discourage others—most notably, landfilling. To accomplish this, landfilling was taxed more heavily than any other treatment or disposal method, incineration was taxed at the lowest rate and resource recovery was not taxed at all. By creating this graduated tax scheme, the Legislature was knowingly reducing revenue.

State Superfund reflects other similar trade-offs, including the exemptions for in-state cleanup and process wastes at the heart of this appeal. As the legislation's sponsor observed, State Superfund was intended to spur private parties to remedy inactive chemical dumps. The tax exemption for in-state cleanup waste furthered this goal, or at least did not discourage it. The

sponsor also noted that State Superfund represented a bargain struck among government, environmental interests and industry, a "compromise between the need for a healthful environment and the practical limitations on both industry and the state" (see. Letter of Support from Senator John R. Dunne to John G. McGoldrick, Governor's Counsel, at 2, supra). The exemption for in-state process waste, a part of this compromise, signaled the Legislature's intention to make sure that New York State businesses would be taxed for these wastes only once, at the point of generation.

Next, we are mindful that over time, the Legislature has retained the in-state cleanup and process waste exemptions, while waste-end taxes have come to play a much diminished role in financing State Superfund. They are no longer the program's primary funding mechanism—as was the case in 1982—or responsible for 20% of its funding—as was the case in 1985. These taxes now make up some portion of IFTA, one of five separate accounts constituting State Superfund. IFTA is restricted to funding half the debt service on the bonds that are by far and away State Superfund's primary source of revenue.

In short, the history of State Superfund demonstrates that the special assessments have always reflected a balancing of several important objectives—the need to raise revenue (especially in the program's early years); the desire to foster environmentally sound disposal methods and generator-financed cleanups of inactive hazardous waste disposal sites located in New York; and the intention to ensure that New York businesses paid only a generator tax and were not subject to indirect payment of the disposal tax as well when they shipped their hazardous waste to an in-state commercial treatment, storage or disposal facility.

Next, we must evaluate the options advocated by the parties in light of this legislative history. Here, Judge Cardozo teaches us that "[s]everance does not depend upon the separation of the good from the bad by paragraphs or sentences in the text of the enactment. The principle of division is not a principle of form. It is a principle of function" (Alpha Portland Cement Co., 230 NY at 60 [citations omitted]).

In this case, we conclude that striking the disposal tax in its entirety is the available option that best furthers the multiple legislative purposes of the special assessments. This approach preserves the generator tax as a revenue stream. It does not

significantly curtail revenues for funding hazardous waste cleanups, as the Appellate Division feared, because waste-end taxes, as a whole, are a small part of State Superfund's overall financing scheme.

The alternative adopted by the Appellate Division and supported by the State—elimination of the exemption from the disposal tax for both in-state cleanup and in-state process waste—would completely thwart express legislative commands. This course of action would effectively double the waste-end taxes paid by generators on in-state process waste, although the Legislature directed them to pay only once. It would also impose a disposal tax on in-state "remediation waste"—a new tax that generators have never before paid.[6] We are not persuaded that the Legislature, if blessed with the gift of foresight, would have chosen to correct the constitutional defect in this way—by double-taxing the hazardous waste generated by New York businesses in their daily operations, and taxing hazardous waste cleaned up to protect New Yorkers' health and the environment, an activity that the Legislature sought to promote.

■ Finally, the State has satisfied due process here by providing CWM with both predeprivation relief in the form of an action for declaratory judgment and postdeprivation relief under Tax Law § 1087. We agree with the Appellate Division that CWM should pursue its refund claim, which involves unresolved factual issues, administratively (*see* ECL 27-0923 [6] [incorporating article 27 of the Tax Law, including sections 1087, 1089 and 1090 regarding refund claims, administrative and judicial review]). *McKesson Corp. v Division of Alcoholic Beverages & Tobacco, Fla. Dept. of Business Regulation* (496 US 18 [1990]) grants a state great flexibility in responding to the determination that it has levied an impermissibly discriminatory tax, and does not mandate that Supreme Court consider CWM's request for a refund in this declaratory judgment action.

---

6. In the technical amendments to chapter 1 of the Laws of 2003, the Legislature amended ECL 72-0403 to exempt hazardous waste generated during government-sanctioned cleanups from the hazardous waste surcharge added by the 2003 legislation (*see* L 2004, ch 577, part I, § 7, adding ECL 72-0403 [1] [m]). ECL 27-0923 (3) (c) was amended consistently at the same time (*see* L 2004, ch 577, part I, § 5 [specifying that exempt hazardous waste must be disposed of pursuant to an order of or agreement or contract with DEC]). These amendments demonstrate the Legislature's continuing interest in affording hazardous waste generated as a result of cleanups more favorable tax treatment than hazardous waste generated by businesses in their daily operations.

Accordingly, the order, insofar as appealed from, should be modified, without costs, by granting judgment declaring in accordance with this opinion and, as so modified, affirmed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and R.S. SMITH concur.

Order, insofar as appealed from, modified, etc.