OPINION OF THE COURT
Phillip R. Rumsey, J.
In this case of first impression, the court is asked to determine whether a local municipality may use its power to regulate land use to prohibit exploration for, and production of, oil and natu *405 ral gas. The controversy arises from the proposed use of high-volume hydraulic fracturing (hydrofracking) to obtain natural gas from the Marcellus black shale formation which underlies the southern portion of New York State. The Town of Dryden is located in the Marcellus shale region.[1] In effect to prohibit hydrofracking, the Dryden Zoning Ordinance was amended on August 2, 2011 to ban all activities related to the exploration for, and production or storage of, natural gas and petroleum (the zoning amendment). Petitioner/plaintiff (Anschutz) owns gas leases covering approximately 22,200 acres in the Town— representing over one third of its total area — that were obtained prior to enactment of the zoning amendment and has invested approximately $5.1 million in activities within the Town.[2] It commenced this hybrid CPLR article 78 proceeding/declaratory judgment action against the Town of Dryden and the Town of Dryden Town Board (collectively the Town) on September 16, 2011 seeking invalidation of the zoning amendment on the basis that it is preempted by the Oil, Gas and Solution Mining Law (ECL art 23 [herein OGSML]). The Town timely answered and moved for dismissal of the article 78 proceeding and for summary judgment declaring the zoning amendment valid.
In light of the high degree of public interest in hydrofracking, the court received several inquiries about the procedure for filing amicus curiae briefs. All who contacted chambers were referred to Kruger v Bloomberg (1 Misc 3d 192 [2003]) and were advised that, absent consent from the parties, a motion would be necessary. Motions seeking leave to file an amicus curiae brief were timely filed by George A. Mathewson, Esq. and Assemblywoman Barbara Lifton.[3] In addition, a motion for leave to intervene was timely filed by Dryden Resources Awareness *406 Coalition (DRAG). Prior to the return date, the court notified the parties and the nonparty movants that the motions for leave to file amicus briefs and to intervene would be considered on submission. Inasmuch as the proposed intervenor would be entitled to participate in all aspects of the case as a party if the motion to intervene were ultimately to be granted, counsel for DRAG was permitted to participate in oral argument on the merits of the petition and the Town’s motions.
Motions for Leave to File Amicus Curiae Briefs
The court has considered the following criteria in deciding whether to permit the filing of amicus curiae briefs: (1) whether the applications were timely; (2) whether each application states the movant’s interest in the matter and includes the proposed brief; (3) whether the parties are capable of a full and adequate presentation of the relevant issues and, if not, whether the proposed amici could remedy this deficiency; (4) whether the proposed briefs identify law or arguments that might otherwise escape the court’s consideration or would otherwise be of assistance to the court; (5) whether consideration of the proposed amicus briefs would substantially prejudice the parties; and (6) whether the case involves questions of important public interest (see Kruger, 1 Misc 3d at 198; see also Rules of Ct of Appeals [22 NYCRR] § 500.23 [a] [4]). No one factor is dispositive. Mathewson and Litton both filed timely motions which indicated their interest in this proceeding/action and included their respective proposed briefs. Although the parties have very capably advanced their respective positions, there is no prejudice to them in permitting the proposed amici to be heard on this case of first impression involving a matter of important public interest (see Kruger, 1 Mic 3d at 196, citing Matter of Colmes v Fisher, 151 Misc 222, 223 [1934]; Matter of Alfred Condominium v City of New York, 2010 NY Slip Op 32178[U] [2010]). Accordingly, the motions should be granted to the extent that the *407 movants present arguments related to the issues in controversy. On that basis, Lifton’s motion for leave to file an amicus curiae brief is granted. With respect to the arguments advanced by Mathewson, both parties correctly note that points II-IV in his proposed brief are wholly unrelated to the matters at issue in this proceeding/action;[4] therefore, his motion for leave to file an amicus curiae brief is granted only to the extent that the court will consider the argument raised in point I of his brief.
The Motion to Intervene
DRAG identifies itself as an unincorporated association which has approximately 71 individual members who are residents or landowners in the Town of Dryden. It timely moved to intervene and submitted a proposed answer, affidavits from its president and five additional members, and a memorandum of law. Its motion is opposed by the parties. Inasmuch, as noted below, as the court has granted the Town’s motion to dismiss the article 78 proceeding, DRAG must show that it is entitled to intervene in the action under the more demanding standards applicable to actions set forth in CPLR article 10.
A party is entitled to intervene as of right only upon a showing that the representation of its interests by the parties is inadequate and that it may be bound by the judgment; both elements must be present (see CPLR 1012 [a] [2]; St. Joseph’s Hosp. Health Ctr. v Department of Health of State of N.Y., 224 AD2d 1008 [1996]; Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C1012:3, at 156-157). Here, DRAG members have shown no substantial interest in the outcome of the action unique from those of any other resident or landowner in the Town of Dryden. As noted by the Town, it is the proper party to defend the zoning amendments which it enacted (see St. Joseph’s Hosp. Health Ctr.). The Town has met that duty by capably advancing its position (see Matter of Spangenberg, 41 Misc 2d 584, 588 [1963]). Moreover, DRAC’s submissions do not materially add to the defense advanced by the Town (see Matter of Mayer, 110 Misc 2d 346 [1981]). Accordingly, DRAG is not entitled to intervene as of right.
*408 With respect to permissive intervention pursuant to CPLR 1013, “[w]hile the only requirement for obtaining an order permitting intervention via this section is the existence of a common question of law or fact, the resolution of such a motion is nevertheless a matter of discretion” (Matter of Pier v Board of Assessment Review of Town of Niskayuna, 209 AD2d 788, 789 [1994]). The factors noted above also weigh in favor of exercising the court’s discretion to deny permissive intervention. Accordingly, DRAC’s motion to intervene is denied.[5] The court will, however, grant DRAG amicus curiae status for the purpose of considering the arguments presented in its brief (see Matter of Pace-O-Matic, Inc. v New York State Liq. Auth., 72 AD3d 1144 [2010]; Kruger, 1 Misc 3d at 196).
The Article 78 Proceeding
Enactment of the zoning amendment was a legislative act (see Matter of Long Is. Pine Barrens Socy. Inc. v Suffolk County Legislature, 31 Misc 3d 1208[A], 2011 NY Slip Op 50534[U] [2011]; see also Matter of Durante v Town of New Paltz Zoning Bd. of Appeals, 90 AD2d 866 [1982]). Unlike challenges directed to the procedures followed in the enactment of an ordinance, challenges to the substantive validity of a legislative act may not be maintained in an article 78 proceeding (see Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 202 [1987]; Matter of Frontier Ins. Co. v Town Bd. of Town of Thompson, 252 AD2d 928 [1998]; Long Is. Pine Barrens Socy. Inc.). Inasmuch as Anschutz challenges only the substantive validity of the zoning amendment — and not the procedures utilized in its enactment — the Town’s motion seeking judgment dismissing that part of the petition and complaint which seeks relief under CPLR article 78 must be, and hereby is, granted.
The Town’s Motion for Summary Judgment (Preemption Analysis)
The Marcellus shale formation extends northeast from Ohio and West Virginia, through Pennsylvania, into southern and central New York.[6] Geologists have long known that the entire formation contains vast quantities of natural gas — as much as *409 489 trillion cubic feet, or over 400 years’ supply for New York at its current level of use — however, the depth of the formation and the tightness of the shale made extraction difficult and expensive. Recent enhancements to the techniques of horizontal drilling and hydrofracking have made recovery of natural gas from the Marcellus shale formation economically viable. As a result, interest in gas production through the use of hydrofracking has, in recent years, increased dramatically throughout the Marcellus region.
To access natural gas using these techniques, a vertical well bore is drilled to a depth just above the target gas-bearing formation. The well bore is then extended horizontally within the gas-bearing rock for up to several thousand feet. Multiple horizontal wells may be drilled laterally from the same vertical bore. After drilling, the horizontal wells are subjected to hydrofracking by pumping fluid into the rock formation at high pressure to create fractures in the rock, thereby increasing the quantity of gas that will flow into the well. The hydrofracking fluid consists of water to which various compounds are added to make the process more effective, such as a propping material, or “proppant,” — like sand — which consists of particles that will remain after the hydrofracking process is complete to hold the fractures open; a gel to carry the proppant into the fractures; a biocide to prevent the growth of bacteria that could damage well piping or plug the fractures; and various other agents intended to ensure that the proppant remains in place or to prevent corrosion of the pipes in the well. Many of the compounds used are toxic. Hydrofracking requires large volumes of water — as much as one million or more gallons for each well— most of which is recovered as waste that must be handled, transported and disposed of properly. Tanker trucks transport water to the well sites and thereafter remove waste fluid. As many as 200 truck loads may be required to supply the water necessary to hydrofrack a single well.
*410 Because hydrofracking may involve the risk of contaminating ground and surface water supplies, it has become extremely controversial. Beginning in 2009, many town residents requested that the Town Board take action to ban hydrofracking within its jurisdiction and a petition containing 1,594 signatures was presented to the Town Board on April 20, 2011 requesting such a ban (see affidavit of Mary Ann Sumner, sworn to Oct. 13, 2011, ¶ 2) .[7] The zoning amendment was enacted in response to those requests (see id. ¶¶2, 3, 15; affidavit of Mahlon R. Perkins, sworn to Oct. 2011, If 13) to, in relevant part, add the following new section to article XXI of the Town’s zoning ordinance:
“Section 2104. Prohibited Uses.
“(1) Prohibition against the Exploration for or Extraction of Natural Gas and/or Petroleum.
“No land in the Town shall be used: to conduct any exploration for natural gas and/or petroleum; to drill any well for natural gas and/or petroleum; to transfer, store, process or treat natural gas and/or petroleum; or to dispose of natural gas and/or petroleum exploration or production wastes; or to erect any derrick, building or other structure; or to place any machinery or equipment for any such purposes.
“(2) Prohibition against the Storage, Treatment and Disposal of Natural Gas and/or Petroleum Exploration and Production Materials.
“No land in the Town shall be used for: the storage, transfer, treatment and/or disposal of natural gas and/or petroleum exploration and production materials.
“(3) Prohibition against the Storage, Treatment and Disposal of Natural Gas and/or Petroleum Exploration and Production Wastes.
“No land in the Town shall be used for: the storage, transfer, treatment and/or disposal of natural gas and/or petroleum exploration and production wastes.
“(4) Prohibition against Natural Gas and/or Petroleum Support Activities.
“No land in the Town shall be used for natural gas and/or petroleum support activities.
*411 “(5) Invalidity of Permits.
“No permit issued by any local, state or federal agency, commission or board for a use which would violate the prohibitions of this section or of this Ordinance shall be deemed valid within the Town.”
(See minutes of special Town Board meeting Aug. 2,
2010, at 14; see also petition and complaint If 17; answer 1Í17).[8]
Anschutz asserts two separate causes of action seeking declaratory judgment that the zoning amendment is invalid— first, that it is expressly preempted by the supersedure clause of the OGSML set forth in ECL 23-0303 and, second, that it is preempted because it impermissibly conflicts with the substantive provisions of the OGSML that directly regulate gas production.
The OGSML contains the following express supersedure clause: “The provisions of this article shall supersede all local laws or ordinances relating to the regulation of the oil, gas and solution mining industries', but shall not supersede local government jurisdiction over local roads or the rights of local governments under the real property tax law.” (ECL 23-0303 [2] [emphasis supplied].) This provision was last amended more than 30 years ago, long before the potential use of hydrofracking to recover natural gas from the Marcellus shale in New York could have been anticipated. Determining whether it preempts enactment of zoning ordinances that regulate where — or whether — operations related to gas production may occur is a matter of first impression, requiring statutory interpretation without consideration of the disparate public opinions about hydrofracking. The Court of Appeals has held that a similar supersession clause contained in the Mined Land Reclamation Law (ECL art 23, tit 27 [herein MLRL]) did not preempt local zoning ordinances (see Matter of Frew Run Gravel Prods. v Town of Carroll, 71 NY2d 126 [1987]). In light of the similarities between the OGSML and the MLRL as it existed at the time of Matter of Frew Run, the court is constrained to follow that precedent in this case.
*412 In Matter of Frew Run, the Court of Appeals considered the following supersedure provision of the MLRL:
“For the purposes stated herein, this title shall supersede all other state and local laws relating to the extractive mining industry, provided, however, that nothing in this title shall be construed to prevent any local government from enacting local zoning ordinances or other local laws which impose stricter mined land reclamation standards or requirements than those found herein.” (ECL 23-2703 [former (2)], as amended by L 1976, ch 477 [emphasis supplied].)
It began its analysis by noting that where, as here, a statute contains an express supersession clause, resolution of the issue turns on proper construction of the clause by interpreting the plain meaning of the text in light of the relevant legislative history and the underlying purposes of the statute. It held that the zoning ordinance did not relate to the extractive mining industry but to an entirely different subject, i.e., land use. The Court itself later concisely summarized its holding in Matter of Frew Run as follows:
“In Frew Run, we distinguished between zoning ordinances and local ordinances that directly regulate mining activities. Zoning ordinances, we noted, have the purpose of regulating land use generally. Notwithstanding the incidental effect of local land use laws upon the extractive mining industry, zoning ordinances are not the type of regulatory provision the Legislature foresaw as preempted by Mined Land Reclamation Law; the distinction is between ordinances that regulate property uses and ordinances that regulate mining activities. In Frew Run, we concluded that nothing in the plain language, statutory scheme, or legislative purpose of the Mined Land Reclamation Law suggested that its reach ‘was intended to be broader than necessary to preempt conflicting regulations dealing with mining operations and reclamation of mined lands’ (id., at 133 [emphasis added]), and that in the absence of a clear expression of legislative intent to preempt local control over land use, the statute could not be read as preempting local zoning authority.” (Matter of Gernatt Asphalt Prods, v Town of Sardinia, 87 NY2d 668 , 681-682 [1996] [citations omitted]; see also Matter of Hunt Bros. v Glennon, 81 NY2d 906, 908- *413 909 [1993]; Preble Aggregate v Town of Preble, 263 AD2d 849, 850 [1999], lv denied 94 NY2d 760 [2000]; Matter of Sour Mtn. Realty v New York State Dept. of Envtl. Conservation, 260 AD2d 920, 923-924 [1999], lv denied 93 NY2d 815 [1999],)[9]
The primary language of the two supersedure clauses is nearly identical. The MLRL provides that “[f]or the purposes stated herein, this title shall supersede all other state and local laws relating to the extractive mining industry” (emphasis supplied), while the OGSML provides that “[t]he provisions of this article shall supersede all local laws or ordinances relating to the regulation of the oil, gas and solution mining industries” (emphasis supplied). Inasmuch as both statutes preempt only local regulations “relating” to the applicable industry, they must be afforded the same plain meaning — that they do not expressly preempt local regulation of land use, but only regulations dealing with operations (see Matter of Frew Run, 71 NY2d at 131, 133). Neither supersedure clause contains a clear expression of legislative intent to preempt local control over land use and zoning. Notably, the MLRL law was amended in 1991 to codify the holding of Matter of Frew Run and, in 1996, the amended supersession clause was construed by the Court of Appeals in Matter of Gernatt to permit a complete ban on mining activities within a municipality. Yet, even in light of this legislative and judicial activity regarding the preemptive scope of the MLRL, there remains an absence from the OGSML — as enacted in 1976 and amended in 1981 to add the supersedure clause — of a clear expression of legislative intent to preempt local zoning control over land use concerning oil and gas production.
Anschutz’s attempts to distinguish the language of the two supersession clauses are unavailing. It argues that the two clauses are different because the MLRL only preempts “local laws,” while the OGSML provides for preemption of “local laws and ordinances,” and that by use of the additional term “ordinances,” the OGSML necessarily preempts zoning ordinances, such as the zoning amendment, where the MLRL does not. Its argument exalts form over substance. Towns are empowered to enact zoning regulations through two different procedures — by *414 ordinance, pursuant to Town Law §§ 261, 264 and 265, and by local law, pursuant to the Statute of Local Governments § 10 (6) and the Municipal Home Rule Law (see Matter of Pete Drown, Inc. v Town Bd. of Town of Ellenburg, 229 AD2d 877 [1996], lv denied 89 NY2d 802 [1996]; Yoga Socy. of N.Y. v Incorporated Town of Monroe, 56 AD2d 842 [1977], appeal dismissed 42 NY2d 910 [1977]; Rice, Practice Commentaries, McKinney’s Cons Laws of NY, Book 61, Town Law § 264, 2012 Pocket Part, at 63-64). Whether a substantive zoning provision is a law or an ordinance is determined solely by the procedure utilized in its enactment. The distinction between laws and ordinances in the area of land use regulations is not significant; indeed, the terms are often used interchangeably (see e.g. Matter of Gernatt, 87 NY2d at 681-682 [refers to zoning ordinances as land use laws having an incidental effect on the extractive mining industry]). Thus, it would be illogical to conclude that the matter of preemption turns on whether a zoning regulation is enacted as a local law or as an ordinance.
Anschutz also argues that the OGSML is not susceptible to the distinction made by the Court of Appeals when it determined that the MLRL preempts only local laws relating to operations, i.e., laws governing “how” are preempted, but not those governing “where.” In that regard, it notes that the supersedure provisions of the MLRL and the OGSML contain different specific exceptions. The OGSML excepts only local government jurisdiction over local roads and rights regarding real property taxation. Anschutz contends that if the supersedure clause preempted only regulation of operations — the “how” — then the exception for local government jurisdiction over local roads would be unnecessary because regulation of roads does not affect operations.[10] Its argument overlooks the fact that hydrofracking depends upon transport of equipment, supplies and large volumes of hydrofracking fluid and waste by truck. Regulation of local roads to restrict or regulate heavy truck traffic, or to require repair of damage caused by such traffic, would plainly relate to operation of gas wells by directly affecting access to well sites or other areas of operation and by imposing additional burdens or costs. Accordingly, because regulation of local roads affects operations, the fact that the supersedure clause contains the exception for jurisdiction over local roads does not support *415 the conclusion that the Legislature intended to preempt local zoning power not directly concerned with regulation of operations.[11]
Nor is the court able to discern any meaningful difference in the purposes of the two laws — both provide for statewide regulation of operations with the primary goal of encouraging efficient use of a natural resource, and the supersedure provisions of both were enacted to eliminate inconsistent local regulation which had impeded that goal. The legislative history and purpose of the MLRL were summarized by the Court of Appeals as follows:
“The purposes of the statute are ‘to foster a healthy, growing mining industry’ and ‘aid in assuring that land damaged by mining operations is restored to a reasonably useful and attractive condition’ (Mem of Governor Wilson, June 15, 1974, filed with Assembly Bill 10463-A, Governor’s Bill Jacket, L 1974, ch 1043). The policy of the State, the Legislature has declared, is ‘to foster and encourage the development of an economically sound and stable mining and minerals industry’ (ECL 23-2703 [1]). To further this policy, the Mined Land Reclamation Law was enacted to ‘establish the badly needed guidelines which would allow for the utilization of the state’s vast mineral resource based in a manner compatible with wise resource management’ and to eliminate ‘[rjegulation on a town by town basis [which] creates confusion for industry and results in additional and unfair costs to the consumer’ (Mem of Department of Environmental Conservation in support of Assembly Bill 10463-A, May 31, 1974, Governor’s Bill Jacket, L 1974, ch 1043). Thus, one of the *416 statute’s aims is to encourage the mining industry by the adoption of standard and uniform restrictions and regulations to replace the existing ‘patchwork system of [local] ordinances’ (id,.).” (Matter of Frew Run, 71 NY2d at 132.)
The legislative history of the 1981 amendments to the OGSML — when the supersedure clause was enacted — similarly states that the purpose is to “promote the . . . development ... of oil and natural gas resources in New York State” (Mem dated July 9, 1981, Bill Jacket, L 1981, ch 846, at 4) and “to provide for the efficient, equitable and environmentally safe development of the State’s oil and gas resources” (Mem of Governor Carey dated July 27, 1981, Bill Jacket, L 1981, ch 846, at 11).[12] Nowhere in the legislative history provided to the court is there any suggestion that the Legislature intended — as argued by Anschutz — to encourage the maximum ultimate recovery of oil and gas regardless of other considerations, or to preempt local zoning authority.
The OGSML contains the following express statement of its purpose:
“It is hereby declared to be in the public interest to regulate the development, production and utilization of natural resources of oil and gas in this state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be had, and that the correlative rights of all owners and the rights of all persons including landowners *417 and the general public may be fully protected, and to provide in similar fashion for the underground storage of gas, the solution mining of salt and geothermal, stratigraphic and brine disposal wells.” (ECL 23-0301.)
The foregoing provision does not state that it is in the public interest to require — or maximize — development of the oil and gas resources of New York State. Rather, it states that the purpose of the OGSML is to regulate any development or production of such resources which may occur in a manner that prevents waste, permits greater ultimate recovery of oil and gas, and protects the correlative rights of all persons. By interpreting the foregoing provision as pertaining to regulation of development and production only in locations where such activities may be conducted in compliance with applicable zoning ordinances governing land use, the OGSML may be construed in a fashion which avoids any “abridgement of a town’s powers to regulate land use through zoning powers expressly delegated in the Statute of Local Governments § 10 (6) and Town Law § 261” (Matter of Frew Run, 71 NY2d at 134).
Nor is any significant difference in the purpose of the two statutes apparent from their respective regulatory schemes. While the OGSML — unlike the MLRL — contains provisions which directly affect where operations may be conducted, such as those governing delineation of pools, well spacing, and integration of units (see ECL 23-0305 [8] [c]; 23-0501, 23-0503, 23-0701, 23-0901), they address technical operational concerns and are intended to further the stated statutory purposes of avoiding waste, providing for greater ultimate recovery of oil and gas and protecting correlative rights. For example, wells must be spaced to comport with the geological features of the underlying pool or formation — taking into consideration the type and depth of the formation and whether there are any field-bounding faults — to allow efficient recovery of the entire field (see ECL 23-0501 [1] [b]; [2] [a]; 23-0503 [2], [3] [a]; [4]). None of the provisions of the OGSML address traditional land use concerns, such as traffic, noise or industry suitability for a particular community or neighborhood (see Town Law § 261; Louhal Props, v Strada, 191 Misc 2d 746, 751 [2002], affd on op below 307 AD2d 1029 [2003]). Thus, zoning regulations do not *418 directly conflict with the provisions of the OGSML that relate to well location.[13]
That the OGSML does not contain a clear expression of legislative intent to preempt local zoning authority (see Matter of Gernatt, 87 NY2d at 682) is further apparent when it is compared to state statutes that indisputably preempt the local zoning power (see e.g. ECL, art 27, tit 11 [siting industrial hazardous waste facilities]; Mental Hygiene Law § 41.34 [siting community residential facilities]). The OGSML differs from such statutes in two significant respects. First, unlike the OGSML, the intent to preempt local zoning ordinances is clearly expressed in the text of the other statutes. ECL 27-1107 states that local municipalities may not require “conformity with local zoning or land use laws and ordinances” (emphasis supplied).[14] Mental Hygiene Law § 41.34 (f) provides that “[a] community residence established pursuant to this section and family care homes shall be deemed a family unit, for the purposes of local laws and ordinances” (emphasis supplied), to preclude local governments from excluding group homes from areas zoned for single-family residences (see also Incorporated Vil. of Nyack v Daytop Vil., 78 NY2d 500, 506-507 [1991] [Mental Hygiene Law § 41.34 expressly withdraws the zoning authority of local governments]; Salkin, 1 NY Zoning Law & Prac § 7:25 [Mental Hygiene Law § 41.34 was designed to preempt local control over planning and zoning decision making]).
Second, these other statutes contain provisions by which the traditional concerns of zoning are required to be considered by the agency charged with deciding whether to issue a permit under state law (see ECL 27-1103 [2] [b], [c], [g], [h]; Mental *419 Hygiene Law § 41.34 [c] [5]). As previously noted, the OGSML does not require consideration of such factors prior to issuance of well permits. To ensure that local concerns are considered, these other statutes require advance notice to, and allow participation by, a municipality in which a proposed facility is to be located (see ECL 27-1105 [3] [c]; 27-1113; Mental Hygiene Law § 41.34 [c]). By contrast, the OGSML only requires that notice be provided to a municipality before drilling commences— after a well permit has been granted (see ECL 23-0305 [13]). A clear legislative intent to preempt local zoning authority is not apparent from the fact that the OGSML does not specifically provide a mechanism for consideration of local concerns. Rather, by construing the OGSML in accordance with its plain meaning — i.e., as superseding only local regulation of operations — it may be harmonized with those statutes that grant the zoning power to local municipalities (see Matter of Frew Run, 71 NY2d at 134). Under this construction, local governments may exercise their powers to regulate land use to determine where within their borders gas drilling may or may not take place, while DEC regulates all technical operational matters on a consistent statewide basis in locations where operations are permitted by local law.
The fact that the zoning amendment bans all operations related to oil and gas exploration and production anywhere within the Town of Dryden does not compel a different result. In Matter of Gernatt, the Court of Appeals rejected the argument that if the land within a municipality contains extractable minerals, then the municipality is required to permit them to be mined somewhere. It held that, inasmuch as the MLRL does not restrict the power to zone, a municipality may exercise its zoning authority to completely ban mining within its jurisdiction. In proceeding to determine that the doctrine of exclusionary zoning does not prohibit use of the zoning power to exclude industrial uses — a point not raised in this case — the Court specifically noted that the zoning power may properly be used to limit the use of natural resources, stating that *420 In light of the determination that the OGSML — like the MLRL — does not preempt local zoning power to regulate uses of land, there is no rational basis for distinguishing Matter of Gernatt; accordingly, the OGSML does not preempt a municipality’s authority — through the exercise of its zoning power — to completely ban operations related to oil and gas production within its borders.[15]
*419 “[a] municipality is not obliged to permit the exploitation of any and all natural resources within the town as a permitted use if limiting that use is a reasonable exercise of its police powers to prevent damage to the rights of others and to promote the interests of the community as a whole.” (Matter of Gernatt, 87 NY2d at 684 [citations omitted].)
*420 Finally, while this is a case of first impression in New York State, the issue of the use of the local zoning power to regulate location of natural gas drilling operations has been considered in several decisions by the highest courts of Pennsylvania and Colorado. While they are not binding precedents in this case, it is instructive that both courts reached the same conclusion as this court did by applying New York precedent — that their respective state’s statute governing oil and gas production does not preempt the power of a local government to exercise its zoning power to regulate the districts where gas wells are a permitted use.
Pennsylvania’s Oil and Gas Act specifically empowers local governments to enact zoning regulations, provided that they do not impose “conditions, requirements or limitations on the same features of oil and gas well operations regulated by this act or that accomplish the same purposes as set forth in this act” (Huntley & Huntley, Inc. v Borough Council of the Borough of Oakmont, 600 Pa 207, 212, 964 A2d 855, 858 [2009] [emphasis and internal quotation marks omitted]). This language is similar to the supersedure provisions of the OGSML and the MLRL, which both preempt only those local laws which regulate operations. In an analysis remarkably similar to that conducted by the Court of Appeals in Matter of Frew Run, the Pennsylvania *421 Supreme Court concluded that the zoning laws serve a different purpose than statutes aimed at efficient production and utilization of a natural resource, i.e., regulation of land use and development (see Huntley, 600 Pa at 225, 964 A2d at 865). It then adopted the same how-versus-where distinction in concluding that a zoning ordinance prohibiting gas wells in a residential district was not preempted by the Oil and Gas Act. In a case decided the same day, it held that a local ordinance that regulated well operations by the imposition of permitting and bonding requirements and by regulation of operations — similar to the one at issue in Matter of Envirogas (112 Misc 2d 432 [1982]) — was preempted by the Oil and Gas Act (see Range Resources Appalachia, LLC v Salem Twp., 600 Pa 231, 964 A2d 869 [2009]). Citing Huntley and Range Resources, Pennsylvania’s intermediate appellate court held that zoning regulations prohibiting gas drilling within the flight path of an airport runway and imposing setback and screening requirements were not preempted by the Oil and Gas Act because they “reflect traditional zoning regulations that identify which uses are permitted in different areas of the locality” (Penneco Oil Co., Inc. v County of Fayette, 4 A3d 722, 733 [2010]).
In a pair of cases that it also decided the same day, the Colorado Supreme Court held that Colorado’s Oil and Gas Conservation Act — which does not contain an express supersedure clause, but contains a purposes clause similar to the OGSML— does not preclude local municipalities from regulating the districts within which gas drilling may occur (see Board of County Commissioners, La Plata County v Bowen/Edwards Assoc., Inc., 830 P2d 1045 [1992]; Voss, 830 P2d 1061 [1992]). It further held that, inasmuch as gas pools do not conform to municipal boundaries, a zoning ordinance that totally banned all drilling within a local government’s borders would be preempted because it would conflict with the state’s interest in fostering efficient development and production of oil and gas reserves. In New York, however, as previously noted, the Court of Appeals has held otherwise — that a total ban on the extraction of natural resources is permissible where the Legislature has not restricted municipal authority to regulate permissible uses of land (see Matter of Gernatt, 87 NY2d at 682-683).[16]
*422 The Zoning Amendment’s Provision Invalidating Permits
The zoning amendment provides that “[n]o permit issued by any local, state or federal agency, commission or board for a use which would violate the prohibitions of this section or of this Ordinance shall be deemed valid within the Town” (Dryden Zoning Ordinance § 2104 [5]). While the Town may regulate the use of land within its borders — even to the extent of banning operations related to production of oil or gas — it has no authority to invalidate a permit lawfully issued by another governmental entity. Rather, enforcement of the provisions of its zoning ordinance relating to the use of land is restricted to those remedies authorized by Town Law § 268 and Municipal Home Rule Law § 10 (4) (a), (b). Moreover, by purporting to invalidate permits that may be issued by any state agency — including DEC — this provision relates directly to regulation of the oil and gas industries and, accordingly, is expressly preempted by the OGSML. Thus, it is invalid.
However, the presence of the invalid provision does not require that the entire zoning amendment be invalidated because it may be severed without impairing the underlying purpose of the zoning amendment (see CWM Chem. Servs., L.L.C. v Roth, 6 NY3d 410, 422-425 [2006]; Wiggins v Town of Somers, 4 NY2d 215, 222 [1958], rearg denied 4 NY2d 1045, 1046 [1958]; St. Joseph Hosp. of Cheektowaga v Novello, 43 AD3d 139, 146 [2007], appeal dismissed 9 NY3d 988 [2007], lv denied 10 NY3d 702 [2008]; see also Dryden Zoning Ordinance § 2101 [“The invalidity of any section or provision of this Ordinance shall not invalidate any other section or provision thereof’]). Accordingly, section 2104 (5) is hereby severed and stricken from the zoning amendment and the Dryden Zoning Ordinance.
Conclusion
Inasmuch as the court is unable to discern any meaningful difference between the language of the supersedure clauses of the MLRL — as it existed when Matter of Frew Run was decided — and the OGSML, or in the respective legislative histories, purposes or regulatory schemes of the two statutes, it *423 is constrained to apply Matter of Frew Run and Matter of Gernatt in determining that the zoning amendment is not preempted by the OGSML. Accordingly, the Town’s motion for summary judgment is granted, and it is adjudged and declared that the zoning amendment — as herein modified by severing and striking section 2104 (5) — is not preempted by the OGSML.

. While the focus is currently on the Marcellus shale formation, hydrofracking may also be used to recover natural gas from the Utica shale formation, which underlies much of southern and western New York — including the Town of Dryden — at depths below the Marcellus shale.

. The facts regarding Anschutz’s activity within the Town were taken from the document entitled, “Affidavit of Pamela S. Kalstrom,” dated September 15, 2011, which was not executed in the manner required of an affidavit because it contains an acknowledgment rather than the required jurat. However, it has been considered, inasmuch as the error in execution does not affect a substantial right of a party (see CPLR 2001; Matter of Smith v Board of Stds. & Appeals of City of N. Y, 2 AD2d 67 [1956]; Federal Natl. Mtge. Assoc, v Graham, 67 Misc 2d 735 [1971]; see also Krug v Offerman, Fallon, Mahoney & Cassano, 245 AD2d 603 [1997]).

. Two additional untimely attempts were made — only days prior to the scheduled return date of November 4, 2011 — to file motions for leave to submit amicus briefs. By two separate letter decisions dated November 2, 2011, the *406 court declined to sign the proposed orders to show cause submitted (1) on November 1, 2011 by Earthjustice, on behalf of Natural Resources Defense Council, Inc., Beverly Ommegang, Theodore Gordon Flyfishers, Inc., River-keeper, Inc. and Catskill Mountainkeeper, and (2) on November 2, 2011 by the Town of Ulysses (see generally Hurrell-Harring v State of New York, 14 NY3d 833 [2010], citing Rules of Ct of Appeals [22 NYCRR] § 500.23 [a] [1] [iii] [illustrating that the Court of Appeals denies untimely filed motions for leave to file amicus briefs]). The Town thereafter attempted to place the brief by the Town of Ulysses before the court, notwithstanding the court’s rejection of the Town of Ulysses’s untimely motion, by filing a supplemental memorandum of law that is substantially identical to the amicus curiae brief proposed by the Town of Ulysses. It has not been considered by the court.

. Points II and III allege that various practices associated with hydrofracking that might be allowed by the OGSML render it unconstitutional, while point IV argues that the draft supplemental generic environmental impact statement related to hydrofracking currently under consideration by the New York State Department of Environmental Conservation (DEC) violates the Equal Protection Clauses of the New York and United States Constitutions.

. In light of the determination that DRAG should not be permitted to intervene, the court need not consider the parties’ arguments that it lacks standing.

. The following information regarding hydrofracking in the Marcellus shale formation was summarized from the “Marcellus Shale” Web page obtained from the New York State Department of Environmental Conservation Web site at http://www.dec.ny.gov/energy/46288.html (site last accessed *409 Feb. 21, 2012), from the U.S. Energy Information Administration Web site at http://www.eia.gov/energy_in_brief/about_shale_gas.cfm (last accessed Feb. 21, 2012), and from the United States Environmental Protection Agency Web site at http://www.epa.gov/hydraulicfracturing/process.html (last accessed Feb. 21, 2012), of which the court takes judicial notice (see generally Matter of Albano v Kirby, 36 NY2d 526, 532-533 [1975]; Kingsbrook Jewish Med. Ctr. v Allstate Ins. Co., 61 AD3d 13, 16, 19-20 [2009]; Grunberger v S & Z Serv. Sta. Inc., 28 Misc 3d 1206[A], 2010 NY Slip Op 51163[U], *3 [2010]; see also Coastal Oil & Gas Corp. v Garza Energy Trust, 268 SW3d 1, 6-7 [Tex 2008] [hydrofracking in nonporous gas-bearing formations explained]).

. According to the 2010 Census, the population of the Town of Dryden was 14,435 on April 1, 2010 (see http://2010.census.gov/2010census/popmap/ index.php) (site last accessed Feb. 21, 2012).

. The zoning amendment also amended appendix A (definitions) of the zoning ordinance by adding definitions for natural gas, natural gas and/or petroleum exploration, natural gas and/or petroleum exploration and production materials, natural gas and/or petroleum production wastes, natural gas and/or petroleum extraction, and natural gas and/or petroleum support activities (see minutes of special Town Board meeting Aug. 2, 2010, at 13-14).

. (Cf. Matter of Envirogas, Inc. v Town of Kiantone, 112 Misc 2d 432 [1982], affd 89 AD2d 1056 [1982], lv denied 58 NY2d 602 [1982] [zoning ordinance providing that no oil or gas well could be constructed without prior payment of a $2,500 compliance bond and $25 permit fee did not relate to land use and was preempted by the OGSML because it directly conflicted with the permit procedure administered by the DEC].)

. Taxation of oil and gas economic units is governed exclusively by Real Property Tax Law article 5, title 5 (RPTL 590 et seq.), enacted concurrently with the 1981 amendment of the OGSML (see RPTL 594).

. The Court of Appeals explained that the MLRL was intended to achieve two different legislative aims — providing statewide standards regulating mining operations and separately permitting stricter local regulation of reclamation to address legitimate local concerns — and that the exception contained in the MLRL for local zoning ordinances imposing stricter standards for reclamation was related only to the second purpose (see Matter of Frew Run, 71 NY2d at 132-134). It did not consider the exception when it decided that the plain meaning of the main clause of the supersedure provision of the MLRL did not preempt local regulation of land use, but only after it turned to consideration of the purpose and history of the statute (see id. at 131-132). Accordingly, that the two supersedure provisions contain different exceptions to preemption is not a basis for ascribing different meanings to the nearly identical language of their respective primary clauses.

. Anschutz submitted an affidavit by Gregory Sovas, who was employed by DEC and its predecessor agency from 1968 until January 2001, in which he provides his opinion regarding the legislative history and purposes of the OGSML and the 1981 amendments thereto and to DEC’s interpretation, implementation and enforcement thereof. It may not be considered, because it is not part of the recognized legislative history (see Matter of Lorie C., 49 NY2d 161, 169 [1980]; McKechnie v Ortiz, 132 AD2d 472, 475 [1987], affd 72 NY2d 969 [1988]; Matter of Morabito v Hagerman Fire Dist., 128 Misc 2d 340, 341 [1985], citing Matter of Lorie C.). In addition, even if it is assumed that his affidavit accurately represents DEC’s interpretation of the supersedure clause, it is not relevant because the issue in the present case involves one of pure statutory interpretation that does not require reliance upon DEC’s knowledge or understanding of underlying operational practices (see Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]; cf. Cortland Regional Med. Ctr., Inc. v Novello, 33 Misc 3d 777, 782-783 [2011, Rumsey, J.], quoting Kurcsics).

. As the Court of Appeals noted, where, as here, there is an express supersedure clause, there is no need to consider implied preemption; resolution of such cases turns on proper construction of the supersedure clause at issue (Matter of Frew Run, 71 NY2d at 130-131). Whether there is conflict between the local ordinance and the state statute is considered as part of the process of statutory interpretation, specifically by measuring the effect of the local ordinance against the purpose of the state statute (id. at 133-134). Here, no impermissible conflict has been found.

. It bears noting that although ECL 27-1105 (2) (f) originally required denial of an application to construct or operate a hazardous waste facility if it “would be contrary to local zoning or land use regulations in force on the date of the application” (Matter of Washington County Cease v Persico, 99 AD2d 321, 324-325 [1984], affd on op below 64 NY2d 923 [1985]), ECL article 27, title 11 was thereafter amended to expressly preempt local zoning authority (see ECL 27-1105 [3] [f]; 27-1107; Weinberg, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17½; ECL 27-1105).

. Although the court recognizes that natural gas extraction — unlike gravel mining — does not necessarily affect the surface of the ground directly over the area from where the natural resource is removed, the fact that the boundaries of formations containing gas may not conform to municipal boundaries is not a logical basis for distinguishing Matter of Gernatt. The same considerations about well location and spacing exist wherever there is a boundary between areas where drilling is permitted and where it is not; therefore, it would be illogical to conclude that a municipality may lawfully exclude gas drilling from certain areas of the municipality, but not the entire municipality (cf. Voss v Lundvall Bros. Inc., 830 P2d 1061 [Colo 1992]). Moreover, because the location of any boundaries between areas where drilling is a permitted use and where it is prohibited by a local zoning ordinance — whether between different districts within a municipality or between different municipalities — will be known when a well permit application is under consideration, DEC may account for such boundaries to efficiently site wells in any areas where drilling is allowed.

. The court does not find Newbury Twp. Bd. of Trustees v Lomak Petroleum (Ohio), Inc. (62 Ohio St 3d 387, 583 NE2d 302 [1992]) instructive in this case. There, the statute at issue was notably different than the OGSML *422 because it permitted a local municipality to prohibit oil or gas well drilling in areas traditionally considered appropriate for such activity based only on health and safety considerations. While acknowledging that municipalities could properly enact zoning regulations based on health and safety concerns, the court invalidated a local zoning ordinance prohibiting gas wells in all residential districts by substituting its own judgment for that of the town in finding that drilling was appropriate in areas used for agricultural production and zoned residential.